# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

11 CIV 8253

| | |
|---|---|
| VASIL PETRO, on behalf of himself and all others similarly situated, | Case No.: |
| Plaintiff, | CLASS ACTION |
| vs. | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| JON S. CORZINE, J. RANDY MACDONALD, HENRI J. STEENKAMP, DAVID P. BOLGER, ALISON J. CARNWATH, EILEEN S. FUSCO, DAVID GELBER, MARTIN GLYNN, EDWARD L. GOLDBERG, DAVID I. SCHAMIS, and ROBERT S. SLOAN, | JURY TRIAL DEMANDED |
| Defendants. | |

RECEIVED
NOV 15 2011
U.S.D.C. S.D. N.Y.
CASHIERS

Vasil Petro ("Plaintiff"), by his attorneys, on behalf of himself and all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, except as to allegations specifically pertaining to plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of MF Global Holdings Ltd. ("MF Global" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media and news reports about the Company, and other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of MF Global common stock.

## I.    INTRODUCTION

1.    This action is a securities fraud action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC brought by plaintiff on behalf of a class of all persons and entities who purchased the

securities of MF Global between May 20, 2010 and October 28, 2011, inclusive (the "Class Period").

2.      During the Class Period, MF Global together with its subsidiaries purported to be one of the world's leading brokers in markets for commodities and listed derivatives. The Company purported to provide access to more than 70 exchanges globally and was a leader by volume on many of the world's largest derivatives exchanges. The Company was an active broker-dealer in markets for fixed income securities, equities, and foreign exchange. On October 31, 2011, MF Global filed for bankruptcy.

3.      In March 2010, Corzine, a former CEO of Goldman Sachs Group Inc and former Governor of New Jersey, became Chairman and CEO of MF Global. Reportedly, since Corzine became Chairman and CEO of MF Global, the Company increased its risk and used its own money to trade, including making investments in European sovereign debt that has plummeted in value. Reportedly, Corzine's strategy was to transform the Company from a futures broker into a boutique investment bank.

4.      Corzine's push into more risky and principal trading with the Company's money was central to MF Global's profit-growing plan and transformation. The MF Global Defendants (as defined below in ¶ 34) represented that they could grow and transform the business without taking on excessive risk, while maintaining adequate capital and liquidity. But while making this transformation, the MF Global Defendants failed to disclose that the Company was undercapitalized, exposed to excessive risk due to massive bets on debt issued by certain European governments, and did not have proper risk controls in place to manage these risks.

5.      Reportedly, in March 2011, U.S regulators began questioning MF Global's use of "repurchase-to-maturity" transactions, also known as "repo-to-maturity" transactions. MF Global's repurchase agreements were a form of collateralized borrowing in which the Company

was selling a lender a security with an agreement to buy it back at a later date. These short-term sales are accounted for as borrowings, not sales, with the pledged assets remaining on the borrower's books.

6.     Reportedly, by June 2011, officials at the Financial Industry Regulatory Authority ("FINRA") noticed MF Global's use of European sovereign debt as collateral in repo-to-maturity transactions and were discussing with MF Global whether the Company should set aside more capital for a growing number of "repurchase to maturity" trades tied to European sovereign debt.

7.     In August 2011, regulators reportedly ordered the Company "to boost its net capital" after "they grew concerned about its exposure to European debt."

8.     Then, on October 24, 2011, Moody's cut MF Global's credit rating and the rating of its debt to just above junk status over concerns that MF Global would not meet its earnings targets and was not sufficiently managing risk as it undergoes a substantial re-engineering of the firm. Under the heading "Ratings Rationale", the Moody's downgrade announcement states, among other things, as follows:

> Moody's . . .said that it has become increasingly concerned with MF Global's risk management and management's ability to prudently balance risk and reward as it undergoes a substantial re-engineering of the firm.
>
> "MF Global's increased exposure to European sovereign debt in peripheral countries and its need to inject capital into its broker-dealer subsidiary to rectify a regulatory capital shortfall highlights the firm's increased risk appetite and raises questions about the firm's risk governance," said Moody's senior analyst Al Bush.

9.     On October 25, 2011, MF Global reported a larger than expected loss of $186.6 million, or $1.16 per share, for the quarter ended September 30, 2011, compared with a year earlier loss of $38.8 million, or $0.59 per share. Additionally, the Company disclosed $6.3 billion in exposure to European sovereign debt. According to the *Wall Street Journal*, "[t]hat exposure is huge considering the firm took in just $12 million in revenue from principal trading

during the latest quarter." On October 25, 2011, the MF Global Defendants also represented that MF Global had $1.3 billion in unused credit facilities.

10.    On October 24-25, 2011, following the Moody's downgrade, the release of the Company's quarterly results, and disclosure of $6.3 billion in European sovereign debt, MF Global's common stock declined by about 50% from a close of $3.68 per share on October 21, 2011 to close at $1.86 per share on October 25, 2011 on heavy trading volume.

11.    On October 26, 2011, Standard & Poor's Ratings Services ("Standard & Poor's") put MF Global's rating on watch for possible downgrade. On October 26, 2011, MF Global's common stock declined by 8.6% to close at $1.70 per share.

12.    On October 27, 2011, Fitch Ratings ("Fitch") downgraded MF Global's long-term debt rating to "junk" status. Also on October 27, 2011, *Bloomberg News* reported that Cantor Fitzgerald and other Wall Street firms were pulling credit lines from MF Global and that it was actively seeking a buyer for its futures brokerage subsidiary. On October 27, 2011, MF Global's common stock declined by $0.27 per share, or about 16%, to close at $1.43 per share.

13.    On October 27, 2011 Moody's further downgraded MF Global's credit rating and the rating of its debt to "junk" status. On October 28, the first trading day after these disclosures, MF Global's stock declined yet another 16%, to close at $1.20 per share.

14.    On October 31, 2011, the *Wall Street Journal* reported that a "tentative agreement" was reached after a weekend of negotiations whereby Interactive Brokers would make an initial bid to acquire MF Global after the Company files for bankruptcy. Additionally, the stock was halted from trading on October 31, 2011. Throughout the day further *Bloomberg News* and *Wall Street Journal* news reports revealed that MF Global had filed for Chapter 11 Bankruptcy, that the Company was suspended from conducting any new business by the Federal Reserve and that the CME Group Inc. ("CME") and Intercontinental Exchange Inc., owners of

4

the two largest U.S. futures markets, had blocked brokers backed by MF Global from the trading floor and were limiting customers to only selling positions.

15.     Subsequently, on the evening of October 31, 2011, the *New York Times* reported that federal regulators had discovered that hundreds of millions of dollars in customer money had gone missing from MF Global in recent days and that regulators were examining whether MF Global diverted some customer funds to support its own trades as the firm teetered on the brink of collapse.

16.     On November 1, 2011, the *Wall Street Journal* reported that as a result of the discrepancy of hundreds of millions of dollars in MF Global's books just before the Company filed for bankruptcy, the Commodity Futures Trading Commission ("CFTC") had voted to issue subpoenas to MF Global and the Federal Bureau of Investigation ("FBI") planned to examine whether client funds are missing.  In addition to the CFTC and FBI, as of November 1, 2011, a number of other regulators such as the SEC and the CME were also reportedly investigating whether MF Global diverted customer money in recent days to support its own trades in a last-ditch effort to save itself — a serious violation of federal rules and regulations governing the proper maintenance of client money.

17.     On November 2, 2011, MF Global's common stock reopened for trading under the symbol "MFGLQ" over the counter on the pink sheets.  On November 2, 2011, MF Global's shares declined by $0.95 per share, more than 79%, to close at $0.25 per share on heavy volume.

18.     On November 4, 2011, the *Wall Street Journal* reported that MF Global may have disguised its debt levels to investors over the past two years by temporarily slashing its short-term borrowings just before publicly reporting its finances each quarter, an activity referred to as "window dressing".  According to the *Wall Street Journal*, "[i]n each of the past seven quarters from late 2009 through mid-2011, MF Global's quarter-end borrowings were an average 16%

lower than the quarterly average." Further, by temporarily slashing its short-term borrowings, which typically reflect increased risk-taking, the Company was not only masking its true levels of borrowing, but also its true levels of risk-taking. In this regard the *Wall Street Journal* states, in part, as follows:

> "For example, in 2010's third quarter, MF 's short-term borrowings were listed as $18.7 billion when it reported to shareholders. During the quarter, however, those borrowings peaked at $28.4 billion – 34% higher – and averaged $24.4 billion during the three-month period, according to the Journal analysis. Short-term borrowing typically pumps up risk-taking, allowing banks to make bigger trading bets.

> Window dressing isn't illegal, but it can mask a financial institution's true levels of borrowing and risk-taking. That is an issue of particular concern with MF Global, where borrowings fueled large trades on European sovereign debt that helped lead to the firm's demise."

19.    On November 4, 2011, Corzine resigned. During the Class Period, more than $1 billion in MF Global common stock and debt were sold. On November 4, 2011, *Bloomberg News* reported that the SEC is reviewing trades in MF Global bonds to determine whether some investors sold the debt based on confidential information before the firm's demise, according to two people with direct knowledge of the matter. According to *Bloomberg News,* investigators are in part focusing on trades that were made ahead of announcements that the firm's credit rating had been downgraded, the people said, speaking on condition of anonymity because the matter isn't public.

## II.    JURISDICTION AND VENUE

20.    The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by Section 27 of the Exchange Act. Venue is proper because MF Global's common stock traded on the New York Stock Exchange in this district throughout the Class Period, many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in

6

substantial part in this District, and because MF Global maintains its headquarters in New York, New York.

21.     In connection with the facts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   **PARTIES**

22.     Plaintiff purchased MF Global common stock as detailed in the certification attached hereto and was damaged thereby.

23.     Defendant Corzine has been the Chairman and CEO of MF Global since March 23, 2010.   Among other things, Corzine signed the Company's Annual Report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010, the Company's Form 10-Qs filed with the SEC on August 6, 2010, November 5, 2010, February 3, 2011, and August 3, 2011, the Company's Annual Report filed on Form 10-K filed with the SEC on May 20, 2011 for the fiscal year ended March 31, 2011, and numerous certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications").

24.     Defendant J. Randy MacDonald ("MacDonald") was the Company's Chief Financial Officer up until March 31, 2011 when he became the Global Head of Retail Services. Among other things, MacDonald signed the Company's annual report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010, the Company's Form 10-Qs filed with the SEC on August 6, 2010, November 4, 2010, and February 3, 2011, multiple SOX Certifications, and the Registration Statement dated February 24, 2010 pursuant to which certain common stock and debt offerings were made during the Class Period.

7

25.     Defendant Henri J. Steenkamp ("Steenkamp") was the Company's Chief Accounting Officer (Principal Accounting Officer) up through March 31, 2011, after which he became the Company's Chief Financial Officer as of April 1, 2011.   Among other things, Steenkamp signed the Company's Annual Report filed on Form 10-K with the SEC on May 20, 2011 for the fiscal year ended March 31, 2011, the Company's 10-Q filed on August 3, 2011, as well as multiple SOX Certifications.

26.     Defendant David P. Bolger ("Bolger") was a Director of MF Global during the Class Period.   Among other things, Bolger signed the Company's Annual Report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010, the Company's Annual Report filed on Form 10-K with the SEC on May 20, 2011 for the fiscal year ended March 31, 2011, and the Registration Statement dated February 24, 2010 pursuant to which certain common stock and debt offerings were made during the Class Period.

27.     Defendant Alison J. Carnwath ("Carnwath") was a Director of MF Global during the Class Period up until her retirement in August 2010.   Among other things, Carnwath signed the Company's Annual Report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010 and the Registration Statement dated February 24, 2010 pursuant to which certain common stock and debt offerings were made during the Class Period.

28.     Defendant Eileen S. Fusco ("Fusco") was a Director of MF Global during the Class Period.   Among other things, Fusco signed the Company's Annual Report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010, Annual Report filed on Form 10-K with the SEC on May 20, 2011 for the fiscal year ended March 31, 2011, and the Registration Statement dated February 24, 2010 pursuant to which certain common stock and debt offerings were made during the Class Period.

29.     Defendant David Gelber ("Gelber") was a Director of MF Global during the Class Period. Among other things, Gelber signed the Company's Annual Report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010, Annual Report filed on Form 10-K with the SEC on May 20, 2011 for the fiscal year ended March 31, 2011, and the Registration Statement dated February 24, 2010 pursuant to which certain common stock and debt offerings were made during the Class Period.

30.     Defendant Martin Glynn ("Glynn") was a Director of MF Global during the Class Period. Among other things, Glynn signed the Company's Annual Report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010, Annual Report filed on Form 10-K with the SEC on May 20, 2011 for the fiscal year ended March 31, 2011, and the Registration Statement dated February 24, 2010 pursuant to which certain common stock and debt offerings were made during the Class Period.

31.     Defendant Edward L. Goldberg ('Goldberg") was a Director of MF Global during the Class Period. Among other things, Goldberg signed the Company's Annual Report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010, Annual Report filed on Form 10-K with the SEC on May 20, 2011 for the fiscal year ended March 31, 2011, and the Registration Statement dated February 24, 2010 pursuant to which certain common stock and debt offerings were made during the Class Period.

32.     Defendant David I. Schamis ("Schamis") was a Director of MF Global during the Class Period. Among other things, Schamis signed the Company's Annual Report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010, Annual Report filed on Form 10-K with the SEC on May 20, 2011 for the fiscal year ended March 31, 2011, and the Registration Statement dated February 24, 2010 pursuant to which certain common stock and debt offerings were made during the Class Period.

9

33.   Defendant Robert S. Sloan ("Sloan") was a Director of MF Global during the Class Period.  Among other things, Sloan signed the Company's Annual Report filed on Form 10-K with the SEC on May 28, 2010 for the fiscal year ended March 31, 2010, Annual Report filed on Form 10-K with the SEC on May 20, 2011 for the fiscal year ended March 31, 2011, and the Registration Statement dated February 24, 2010 pursuant to which certain common stock and debt offerings were made during the Class Period.

34.   The individuals named as defendants in ¶¶ 23 - 33 are referred to herein as the "MF Global Defendants".  The MF Global Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MF Global's press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of the MF Global Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## IV.   RELEVANT NON-PARTY

35.   MF Global, headquartered in New York, was a leading broker in markets for commodities and listed derivatives as discussed above in ¶2.  MF Global's common stock traded on the New York Stock Exchange ("NYSE").  On October 31, 2011, MF Global filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  For this reason, MF Global is not named as a defendant.

## V.   CLASS ACTION ALLEGATIONS

36.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased the publicly traded securities of MF Global between May 20, 2010 and October 28, 2011, inclusive.

37.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members of the Class located throughout the United States.  As of April 30, 2011, MF Global had over 163 million shares of common stock outstanding.

38.   Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

## VI.   FALSE AND MISLEADING STATEMENTS

39.   The Class Period begins on May 20, 2010, shortly after Corzine became Chairman and CEO of MF Global in March 2010.  On May 20, 2010, the MF Global Defendants caused the Company to issue a press release and filed the same with the SEC on Form 8-K reporting its fourth quarter and fiscal year 2010 financial results that stated, in part, as follows:

> "This company has tremendous potential and a timely opportunity to make significant inroads into the broader financial services industry," Mr. Corzine continued. "As profitability improves and we ensure the appropriate controls are

in place, we will look to enhance our revenue potential by supporting our client activities with more principal risk taking."

40.     During the May 20, 2010 conference call reporting fourth quarter 2010 earnings, Corzine announced certain aspects of "building the firm's updated strategic plan" and stated, in part, as follows:

> Over the near term, we will extend our client facilitation efforts to include principal risk taking across most product lines. Our fixed income and U.S. Treasury businesses already incorporate this approach. It's clear to me that we can expand revenues meaningfully by this extension. . . . As we grow these activities, we will be mindful of the necessity to enhance and reconfirm our operational and control functions, and to secure the talent necessary to manage attendant market risks.
>
> I want to be clear. I don't anticipate increasing our current risk appetite in the near-term, but we will encourage facilitation desks to operate more aggressively, within our existing limits.

41.     On May 28, 2010, the MF Global Defendants caused the Company to file its Annual Report on Form 10-K for the fiscal year ended March 31, 2010 ("2010 10-K). The 2010 10-K was signed by the MF Global Defendants and states, among other things, the following:

> **Risk Management**
> . . . [W]e have established—and continue to evolve and improve—a global enterprise wide risk management framework to manage all aspects of our risks. The risk-management framework globally embeds a robust risk-management environment through a strong governance structure that (i) clearly defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific individuals, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk.
>
> * * *
>
> Senior management takes an active role in the risk management process and expects all employees to understand and comply with their delegated risk responsibilities, relevant risk policies, and compliance requirements. Additionally, all employees are expected to escalate risk incidents and any

matters of concern to management in order to ensure timely risk-mitigation action by the appropriate personnel. '

Our Chief Risk Officer regularly reports to our Board of Directors. Reports detail global risk exposures and escalate risks that exceed defined tolerances. The risk reporting process is designed to enable us to assess the levels of risk present throughout our operating environment on a near real-time basis and to take any necessary remedial action in a timely manner.
See also "Item 7A. Quantitative and Qualitative Disclosures about Market Risk."

\* \* \*

### *Regulation and Exchange Memberships*

\* \* \*

Minimum capital requirements are a significant part of the regulatory framework in which we operate. We are subject to stringent minimum capital requirements in the United States, the United Kingdom and several other jurisdictions. These rules which specify the minimum amounts of capital that we must have available to support our clients' open trading positions, including the amount of assets we must maintain in relatively liquid form, are designed to measure general financial integrity and liquidity. Compliance with minimum capital requirements may limit our operations if we cannot maintain the required levels of capital

\* \* \*

### *Principal Transactions*

\* \* \*

On a limited basis, we may also enter into unhedged principal transactions in order to monetize our market views. We expect to increasingly recognize trading income as part of our ongoing activity for our clients in various markets, and to selectively increase our risk taking, generally making fuller use of our current risk appetite and operating within the authority delegated by our board.

\* \* \*

### *Regulatory Capital Risk*

\* \* \*

**To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements.** . . . In addition, we monitor regulatory developments regarding capital requirements and prepare for increases in the required minimum levels of regulatory capital that may occur in the future. (emphasis added).

13

* * *

*Operational Risk*

. . . . To mitigate operational risks, the Operational Risk Department ensures the application of a globally consistent operational risk management framework. The framework includes firm-wide policies, standards and processes for risk identification, assessment, mitigation and reporting in order to create a more transparent and accountable operational risk environment.

* * *

**Management's Report on Internal Control over Financial Reporting**

Management of MF Global Holdings Ltd. together with its consolidated subsidiaries (the "Company"), is responsible for establishing and maintaining adequate internal control over financial reporting.

The Company's internal control over financial reporting is a process designed under the supervision of the Company's principal executive and principal financial officers to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external reporting purposes in accordance with accounting principles generally accepted in the United States of America.

* * *

42.     The 2010 10-K also includes SOX Certifications of defendants Corzine and

MacDonald, which represent as follows:

1. I have reviewed this Annual Report on Form 10-K for the fiscal year ended March 31, 2010 of MF Global Holdings Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

14

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

43.    On June 3, 2010, the Company filed a Prospectus Supplement with the SEC on Form 424(b)(5) dated June 2, 2010 in connection with the secondary public offering of 22,535,211 shares of MF Global common stock at $7.10 per share for approximate proceeds of $160 million.   The Prospectus Supplement, which was issued pursuant to a Registration

Statement filed with the SEC on Form S-3 dated February 24, 2010 signed by defendants MacDonald, Bolger, Carnwath, Fusco, Gelber, Glynn, Goldberg, Schamis, and Sloan, among other things, incorporates by reference the Company's 2010 Form 10-K and the Company's Form 8-K filed with the SEC on May 20, 2011.

44.     On August 5, 2010 MF Global reported its fiscal first quarter 2011 financial results and held a conference call to discuss these results.  During the May 20, 2011 conference call , defendant Corzine stated, in part, as follows:

> **Systemic exposure for MF Global will be markedly less as highly leveraged and concentrated risk held by institutions perceived as too big to fail will be constrained. While we also may be constrained by the new regulatory environment, the spreading of risks across the system will take us out of being a collateral victim of a systemic breakdown. A stronger system makes for a more secure environment for us.** (emphasis added).

45.     During the August 5, 2010 conference call CFO MacDonald stated, in part, as follows:

> We also saw some good opportunities in sovereign debt markets as a result of the European economic crisis and we've maintained our laddered approach to maturities consistent with the last quarter by extending approximately 8 billion, or 59% of our average balances, into longer dated maturities, with the average maturity of the extended portfolio being 9 months. And in the blended portfolio of 13 billion has an average duration of 6 months. Now our view on interest rates is they are probably not changing in the next 4 quarters. So as a result, we will consider extending the maturity of our total portfolio out another quarter.

> \*   \*   \*

> So finally, the company maintains a strong liquidity position, which I'll show you in slide 11. On the first row is total required capital for the regulated companies of 1.3 billion. On the second row is the capital for the unregulated companies, primarily our holding company and the finance companies so total capital of the firm is 2.2 billion. The required capital of the firm is 1.8 billion, which is level with the March quarter. And this is after using more client facilitation and principal trading.

46.     During the August 5, 2010 conference call CFO MacDonald had the following dialogue with an analyst regarding risk:

> **<Q - Richard Repetto>**: My other question is, Jon, this increased customer facilitation it's amazing results you're getting with a lower balance sheet, lower VAR or equal VAR let's say. And I guess my question is, are there any other risk metrics because there are the VAR lower balance sheet in Europe but then in capturing the risk picture – are there any other metrics that gets offered to investors?
>
> **<A - J. Randy MacDonald, Chief Financial Officer>**: You have to have – you have to stress your positions to a worse case. And I think you want to look at turnover ratios. Ultimately, we are very keen at this stage to make sure that we are only operating in the most liquid markets, foreign exchange and actually not very much in our emerging market activities yet in U.S. treasuries. All the exchange traded derivatives with the commodity markets where – while there is a lot of price volatility there is actually fairly deep markets for entry and exit.
>
> So in the next, I don't know, 4 to 6 quarters as we build out our long-term business strategy – strategic plans, I think you will see us mostly in high velocity space in the trading markets. We have not increased a penny our tier three assets and we're not in any significant way than adding tier two assets. So we're keeping a very liquid balance sheet. I think those are the kinds of metrics that turnover statistics and making sure that we actually have viable stress test against positions.

47.     On August 6, 2010, defendants Corzine and MacDonald caused the Company to file its Quarterly Report on Form 10-Q for the fiscal first quarter ended June 30, 2010 ("First Quarter 2011 Form 10-Q), which refers investors back to the 2010 Form 10-K for further information on the risks of operation and the Company's financial and operational condition, among other things.

48.     The First Quarter 2011 Form 10-Q filed on August 6, 2010 also states, in part as follows:

> ***Regulatory Capital Risk***
>
>                         *    *    *
>
> **To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of**

**regulatory capital as necessary to ensure compliance with all regulatory capital requirements.** (emphasis added).

\* \* \*

*Operational Risk*

. . . .To mitigate operational risks, the Operational Risk Department ensures the application of a globally consistent operational risk management framework. The framework includes firm-wide policies, standards and processes for risk identification, assessment, mitigation and reporting in order to create a more transparent and accountable operational risk environment.

\* \* \*

Additionally, we consider the inherent operational risk in new products, systems, and business activities as they are developed or modified.

49.     The First Quarter 2011 Form 10-Q was signed by defendants Corzine and MacDonald, and includes SOX Certifications of defendants Corzine and MacDonald substantially the same as in ¶ 42 above.

50.     On November 4, 2010 MF Global issued a press release reporting its fiscal second quarter 2010 financial results for the period ending September 30, 2010 and stated, in part, as follows:

"Our transition to delivering a more compelling value proposition to our clients is ongoing," said Jon S. Corzine, chairman and chief executive officer of MF Global. "While there is much more we must accomplish, our progress over the last six months is marked by lower levels of leverage, a stronger balance sheet, and sizable cost and headcount reductions. At the same time, we have strengthened our earnings profile."

\* \* \*

"More effective use of our capital and balance sheet are important steps in directing our resources to areas with more substantial returns," said Randy MacDonald, chief financial officer of MF Global. "This effort has translated to an improved cash flow and earnings profile."

51.    On November 4, 2010 MF Global held a conference call to discuss its fiscal second quarter financial results.  During the November 4, 2010 conference call, defendant Corzine stated, in part, as follows:

> Our principle trading activities contributed modestly to quarterly revenues as we **cautiously moved into dealer and strategic trading activities**. Our average daily VaR for the quarter was $4.8 million, well below 50% of the risk appetite authorized by our Board.
>
> <div align="center">*   *   *</div>
>
> We also recently **established a Principal Strategies Group to enhance revenue growth and help build a measured risk taking culture**.
>
> (emphasis added).

52.    During the November 4, 2010 conference call defendant Corzine also had the following dialogue with an analyst:

> **<Q - Richard Repetto>**: And it will be interesting to see you get back to your retail roots, Randy, as well. But anyway, my one follow up question would be on the Principal Strategies Group, Jon in proprietary trading, can you talk more, you did mention the bar during the prepared remarks, but can you talk about the opportunity, the people you're getting, what products will be. The bank is, let's say transforming their prop trading desk and could you just give us color on your strategy there?
>
> **<A - Jon S. Corzine, Chairman & Chief Executive Officer>**: First of all, as you can follow in the financial press, we have had an opportunity to have conversations with some of the most successful and productive proprietary traders. We've hired two individuals to join a team of someone that is inside the firm today and we will look for one or two additional individuals. We want to stay in high turnover mode within our proprietary activities. We will be in the liquid in for the most part of our activities. Don't expect it to have dramatic impact on our earnings in the near term, although we do look to steadily grow book. I think it is important in two respects, one obviously from the revenue generating aspect, but as you know, this firm historically worked from a broker model and had less understanding and comfort with a market making risk management culture with respect to activities in risk taking. And I think it is important for seeding that inside our organization as we go forward to demonstrate not just for the purposes of success of the Group but that we can take and manage risk successfully for purposes of generating revenue I think will help enhance the culture in our day-to-day trading activities.
>
> **<Q - Richard Repetto>**: Okay, that's very helpful. It's been interesting watching the transformation of the firm.

Thanks.

**<A - Jon S. Corzine, Chairman & Chief Executive Officer>**: Believe me, we are going to go slow. I chose my words very carefully. We're going to know the people. We're going to know the risk appetite in addition to the metrics that are necessary and I'm very closely involved with this myself.

53.     On November 5, 2010, defendants Corzine and MacDonald caused the Company to file its Quarterly Report on Form 10-Q for the fiscal second quarter ended September 30, 2010 ("Second Quarter 2011 Form 10-Q), which refers investors back to the 2010 Form 10-K for further information on risks of operation and the Company's financial and operational condition, among other things.

54.     The Second Quarter 2011 Form 10-Q filed on November 5, 2010 also states, in part as follows:

*Capital Risk*

<div align="center">*   *   *</div>

**To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements.**  (emphasis added).

<div align="center">*   *   *</div>

*Operational Risk*

<div align="center">*   *   *</div>

To mitigate operational risks, the Operational Risk Department ensures the application of a globally consistent operational risk management framework. The framework includes firm-wide policies, standards and processes for risk identification, assessment, mitigation and reporting in order to create a more transparent and accountable operational risk environment.

<div align="center">*   *   *</div>

Additionally, we consider the inherent operational risk in new products, systems, and business activities as they are developed or modified.

55.    The Second Quarter 2011 Form 10-Q was signed by defendants Corzine and MacDonald, and includes SOX Certifications of defendants Corzine and MacDonald substantially the same as in ¶ 42 above.

56.    On February 3, 2011 MF Global issued a press release reporting its fiscal third quarter 2010 financial results for the period ending December 31, 2010 and stated, in part, as follows:

> "We are using the assets of our firm more effectively than ever before," said Randy MacDonald, chief financial officer, MF Global. "Our progress is evident on many fronts: enhanced productivity, the resizing of our matched repo book relative to market opportunity, improved leverage ratios, increased client confidence and payables as well as an improving earnings profile. As we look to continue to align our balance sheet and capital structure to support our long-term strategy, we remain focused on extending the permanency of our capital, improving our cash flow and providing the resources necessary to execute our plan."

<p style="text-align:center">*   *   *</p>

> In line with the firm's transition to an investment bank, Michael Stockman has been named global chief risk officer. In this role, Mr. Stockman will oversee management of the firm's global risk profile including market, credit and operational risk.

57.    On February 3, 2011, defendants Corzine and MacDonald caused the Company to file its Quarterly Report on Form 10-Q for the fiscal third quarter ended December 31, 2010 ("Third Quarter 2011 Form 10-Q), which refers investors back to the 2010 Form 10-K for further information on risks of operation and the Company's financial and operational condition, among other things.

58.    The Third Quarter 2011 Form 10-Q filed on February 3, 2011  also states, in part as follows:

***Capital Risk***

<p style="text-align:center">*   *   *</p>

**To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements.** (emphasis added).

\* \* \*

*Operational Risk*

. . . . To mitigate operational risks, the Operational Risk Department seeks to apply a globally consistent operational risk management framework. The framework includes firm-wide policies, standards and processes for risk identification, assessment, mitigation and reporting in order to create a more transparent and accountable operational risk environment.

\* \* \*

Additionally, we consider the inherent operational risk in new products, systems, and business activities as they are developed or modified.

59.    The Third Quarter 2011 Form 10-Q was signed by defendants Corzine and MacDonald, and includes SOX Certifications of defendants Corzine and MacDonald substantially the same as in ¶ 42 above.

60.    On February 8, 2011, the Company filed a Prospectus Supplement with the SEC on Form 424(b)(2) dated February 7, 2011 in connection with the public offering of $250 million worth of the 1.875% Notes.  The Prospectus Supplement, which was issued pursuant to a Registration Statement filed with the SEC on Form S-3 dated February 24, 2010 signed by defendants MacDonald, Bolger, Carnwath, Fusco, Gelber, Glynn, Goldberg, Schamis, and Sloan, incorporates by reference the Company's 2010 Form 10-K, First Quarter 2011 Form 10-Q, Second Quarter 2011 Form 10-Q, and Third Quarter 2011 Form 10-Q, among other things.

61.    On May 19, 2011, MF Global held a conference call to discuss its fiscal fourth quarter and full year 2011 financial results.  During the May 19, 2011 conference call defendant Corzine stated, in part, as follows:

As we execute our plans and continue expanding our sales and trading operations we would expect our capital commitments to increase. Undoubtedly, measured risk taking will be a part of our build out to an investment bank. The path to a

more diversified revenue model may, from time-to-time, include periods of risk concentration as opportunities present themselves and our business model matures. That said, diversity of exposure and revenues is key to our risk management philosophy.

62.     During the May 19, 2011 conference call defendant Corzine also had the

following dialogue with an analyst inquiring about the Company's capital structure:

> **Q - Howard H. Chen>**: Good morning Jon, good morning Henri. Jon, on the capital structure, you noted you'd be opportunistic in terms of tapping the markets, but as you think about the longer term vision of the company, what do you ultimately want the optimal capital structure to be?
>
> **<A - Jon S. Corzine>**: Howard, my optimal capital structure is built on retained earnings. That's why we are focused on getting to GAAP, that's why we're focused on ROE. The main way to generate capital, and you then will have debt-to-equity capacity built because you're generating internal capital, is our objective. I'm a very simple person about that, and I like the EBITDA because we're generating cash that does that, those are – that's another metric that I think one has to keep an eye on.
>
> But we want to do this internally as much as possible, and we clearly were undercapitalized, in my view. **I didn't like our capital structure when I came in. I said that very clearly in the first quarterly call, and we've taken steps to address those issues.** We will continue to opportunistically strengthen this capital structure. It's not, not long run, my desire to be using a liquidity facility for capitalization. So, I think there's some pretty common sensical steps that we will take, but the basic growth in book is what I'm interested in generating through retained earnings, and we're hell-bent on getting there.   (emphasis added).

63.     During the May 19, 2011 conference call, defendant Steenkamp stated, in part, as

follows:

> As Jon mentioned, we saw principal trading opportunities in European Sovereigns this quarter. By entering into resale and repurchase transactions to maturity, as we do in U.S. government securities, we are able to capture arbitrage opportunities in these markets. We believe the market risk to these trades is minimal as these are held to maturity. While we retain exposure to the underlying credit throughout the maturity period, the duration of these trades is short-term in nature.

64.     On May 20, 2011, defendants Corzine, Steenkamp, Bolger, Fusco, Gelber,

Glynn, Goldberg, Schamis and Sloan caused the Company to file its Annual Report on Form

23

10-K for the fiscal year ended March 31, 2011 ("2011 Form 10-K). The 2011 Form 10-K was signed by defendants Corzine and Steenkamp and states, among other things, the following:

**Risk Management**

. . [W]e have established—and continue to evolve and improve—a global enterprise wide risk management framework that is intended to manage all aspects of our risks. The risk-management framework is designed to establish a global, robust risk-management environment through a strong governance structure that (i) defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific businesses and risk managers, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk.

*   *   *

Senior management takes an active role in the risk management process and expects employees to understand and comply with their delegated risk responsibilities, relevant risk policies, and compliance requirements. Additionally, employees are expected and encouraged to escalate risk incidents and any matters of concern to management in accordance with our internal escalation policy to promote timely risk-mitigation action by the appropriate personnel.

Reports detail global risk exposures and escalate risks that exceed defined thresholds. Our risk reporting process is designed to enable us to assess the levels of risk present throughout our operating environment and to take any necessary remedial action in a timely manner. As part of this reporting process, risk reports detailing global risk exposures and escalating risks that exceed defined thresholds are regularly generated.

*   *   *

**Regulation and Exchange Memberships**

*   *   *

Minimum capital requirements are a significant part of the regulatory framework in which we operate. We are subject to stringent minimum capital requirements in the United States, the United Kingdom and several other jurisdictions. These rules, which specify the minimum amounts of capital that we must have available to support our clients and our own open trading positions, including the amount of assets we must maintain in relatively liquid form, are designed to measure general financial integrity and liquidity. Compliance with minimum capital requirements may limit our operations, or limit our ability to implement our strategic plan, if we cannot maintain the required levels of capital, or if we cannot increase them following changes in regulation. Moreover, any change in these rules or the imposition of new rules affecting the scope, coverage, calculation or

amount of capital we are required to maintain could restrict our ability to operate our business and adversely affect our operations. We currently maintain regulatory capital in excess of all applicable requirements.

\*    \*    \*

## Liquidity and Capital Resources

We have multiple sources of liquidity. We expect our primary liquidity needs over the next 12 months to be for working capital, debt service obligations and preferred dividend obligations. Subject to the discussion below regarding our changing liquidity needs as a result of the implementation of our strategic plan, we believe we will have sufficient liquidity to meet these obligations given our expected cash flows from operations and our available sources of liquidity.

\*    \*    \*

## REGULATORY CAPITAL RISK

\*    \*    \*

To mitigate this risk, **we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements.** Regulatory authorities may increase or decrease these requirements from time to time. We also maintain internal early warning levels and excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy. In addition, we monitor regulatory developments regarding capital requirements and prepare for increases in the required minimum levels of regulatory capital that may occur in the future. If not properly monitored and adjusted, our regulatory capital levels could fall below the required minimum amounts set by our regulators, which could expose us to various sanctions ranging from fines and censure to imposing partial or complete restrictions on our ability to conduct business. (emphasis added).

## OPERATIONAL RISK

\*    \*    \*

Operational risk is inherent in each of our business areas including revenue-generating, support and control activities; therefore, the primary day-to-day responsibility for managing operational risk rests with these areas. Each area has established processes, systems and controls to manage operational risk and is responsible for escalating incident, issues, and control indicators. Reports are summarized for senior management and governance committees. Additionally, we consider the operational risk in new products, systems, and business activities as they are developed or modified.

We maintain a continuous and collaborative Operational Risk Management Framework which establishes an effective environment is designed to identify, assess, measure, monitor and mitigate operational risk across all of our business areas. The Operational Risk Committee, which is chaired by the Global Head of Operational Risk and is a key component of the Enterprise Risk Management Governance structure, provides oversight of the Operational Risk Management Framework and provides a forum for senior management to assess the operational risk profile of the organization. The Global Head of Operational Risk reports to the Chief Risk Officer. The Operational Risk department is a risk management and assurance function that is independent of the revenue-generating areas. The Operational Risk department's primary objective is to develop, implement, and maintain our Operational Risk Management Framework. The Operational Risk department works with all business areas to help ensure transparency, awareness, and accountability of risks.

*   *   *

**Management's Report on Internal Control over Financial Reporting**

Management of MF Global Holdings Ltd. together with its consolidated subsidiaries (the "Company"), is responsible for establishing and maintaining adequate internal control over financial reporting.

The Company's internal control over financial reporting is a process designed under the supervision of the Company's principal executive and principal financial officers to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external reporting purposes in accordance with accounting principles generally accepted in the United States of America.

65.     The 2011 Form 10-K includes SOX Certifications of defendants Corzine and Steenkamp substantially the same as in ¶ 42 above.

66.     On July 28, 2011 MF Global issued a press release and filed a Form 8-K with the SEC reporting its fiscal first quarter 2012 financial results that stated, in part, as follows:

"With net revenue and GAAP net income at their highest levels in nearly three years, this quarter's results reflect continued progress in MF Global's ongoing transformation," said Jon S. Corzine, chairman and CEO, MF Global. "We have made important strides in diversifying our revenue streams, expanding our trading capacity and upgrading talent, as well as in investing in the infrastructure necessary to execute our vision. We believe the depth and breadth of our transformation will continue as we enhance our capital markets offering, focus our global retail services, and more effectively organize our prime services capabilities."

Mr. Corzine continued, "As we enter the final stages of the firm's core restructuring, we continue to evaluate both organic and strategic actions to accelerate our strategy of building an investment bank that will deliver growing revenues and competitive returns on capital. Our ongoing evaluations and financial performance will dictate the timing of our investment and hiring initiatives."

**First Quarter 2012 Results**

Revenue, net of interest and transaction-based expenses (net revenue), was $314.5 million for the first quarter, versus $289.4 million for the same period last year. The increase in net revenue was primarily due to the expansion of client facilitation and principal activities, particularly within structured equity finance, commodities and fixed income.

67.     On July 28, 2011, MF Global held a conference call to discuss its fiscal first quarter 2012 results. During the May 20, 2011 conference call, defendant Steenkamp stated, in part, as follows:

As mentioned last quarter, we continue to enter into resell and repurchase transactions to maturity in U.S. government securities and European sovereigns. This enables us to capture arbitrage opportunities in these markets, **and we continue to believe market risks to these trades is minimal as these are held to maturity**. While we retain exposure to the underlying credit throughout the maturity period, the duration of trade is short-term in nature. (emphasis added).

68.     On August 1, 2011, the Company filed a Prospectus Supplement with the SEC on Form 424(b)(2) dated July 28, 2011 in connection with the public offering of $325 million worth of the 3.375% Notes. The Prospectus Supplement, which was issued pursuant to a Registration Statement filed with the SEC on Form S-3 dated February 24, 2010 signed by defendants MacDonald, Bolger, Carnwath, Fusco, Gelber, Glynn, Goldberg, Schamis, and Sloan, incorporates by reference the Company's 2011 Form 10-K, and Form 8-K filed on July 28, 2011 reporting financial results for the first fiscal quarter 2012 ended June 30, 2011, among other things.

69.     On August 3, 2011, defendants Corzine and Steenkamp caused the Company to file its Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2011 ("First

Quarter 2012 Form 10-Q"). The First Quarter 2012 Form 10-Q was signed by defendants Corzine and Steenkamp and states, among other things, the following:

> The Company also enters into certain resale and repurchase transactions that mature on the same date as the underlying collateral ("reverse repo-to-maturity" and "repo-to-maturity" transactions, respectively). These transactions are accounted for as sales and purchases and accordingly the Company de-recognizes the related assets and liabilities from the consolidated balance sheets, recognizes a gain or loss on the sale/purchase of the collateral assets, and records a forward repurchase or forward resale commitment at fair value, in accordance with the accounting standard for transfers and servicing. For these specific repurchase transactions that are accounted for as sales and are de-recognized from the consolidated balance sheets, the Company maintains the exposure to the risk of default of the issuer of the underlying collateral assets, such as U.S. government securities or European sovereign debt. The forward repurchase commitment represents the fair value of this exposure and is accounted for as a derivative. The value of the derivative is subject to mark to market movements which may cause volatility in the Company's financial results until maturity of the underlying collateral at which point these instruments will be redeemed at par. At June 30 and March 31, 2011, securities purchased under agreements to resell of $5,233,156 and $1,495,682, respectively, at contract value, were de-recognized, of which 94.2% and 72.0%, respectively, were collateralized with European sovereign debt, consisting of Italy, Spain, Belgium, Portugal and Ireland. At June 30 and March 31 2011, securities sold under agreements to repurchase of

<div align="center">*   *   *</div>

> **Note 17: Regulatory Requirements**
>
> The Company conducts its securities and commodities businesses though several regulated subsidiary entities around the world which are subject to the rules and regulations of the applicable local supervisory authorities and principal exchanges of which they are members. These supervisory authorities and exchanges each have defined capital requirements which the respective subsidiaries of the Company are subject to. The two principal subsidiary entities of the Company conducting such business are MFGI in the U.S. and MF Global UK Limited ("MGFUKL") in the U.K. MFGI, a futures commission merchant and securities broker-dealer, is required to maintain minimum net capital equal to the greater of the amount required by the SEC or CFTC, as defined. At June 30, 2011, MFGI had net capital, as defined, of $570,931, net capital requirements of $399,976, and excess net capital of $170,955.
>
> MFGI is subject to certain notifications and other provisions of the net capital rules of the SEC regarding advances to affiliates, repayments of subordinated liabilities, dividend payments and other equity withdrawals. At June 30, 2011, MFGI was in compliance with all of these provisions.

\* \* \*

"Regulators may, in addition to setting minimum capital requirements, require that regulated firms hold capital over the minimum amounts as early warning levels to address potential risk which may crystallize in periods of market stress.

\* \* \*

As of June 30, 2011, the ending balance of the Company's repurchase agreements qualifying for sales accounting was $16.6 billion, which was 12.9% higher than the quarterly average balance of repurchase agreements qualifying for sales accounting of $14.7 billion. The difference is principally attributable to the Company's increased trading in repurchase agreements qualifying for sales accounting with respect to opportunities available in European sovereign debt markets. Volatility in the European sovereign debt markets created occasional dislocations in the cash and repurchase markets for certain short dated securities, providing more trading opportunities in the quarter ending June 30, 2011.

\* \* \*

*Liquidity and Capital Resources*

The Company has multiple sources of liquidity and expects its primary liquidity needs over the next 12 months to be for working capital, debt service obligations and preferred dividend obligations. Subject to the discussion below regarding its changing liquidity needs as a result of the implementation of its strategic plan, the Company believes it will have sufficient liquidity to meet these obligations given its expected cash flows from operations and its available sources of liquidity.

\* \* \*

**As a matter of policy, the Company maintains excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events.** (emphasis added).

\* \* \*

*Risk Management*

*Overview*

The risk oversight committees monitor and manage risk company-wide and report on risk at the Board and senior management levels. Dedicated committees address various financial, non-financial and regional risks. The Company's senior management leads and actively participates in many of these risk committees. Risk officers are active participants in many strategic and business committees. The Company believes that effective risk management is only possible with

effective communication and maintaining an open dialogue between the Board, senior management, business areas, and the Risk department.

The enterprise risk management framework employs this governance structure, which is intended to embed a strong risk culture and clearly define roles and responsibilities for risk taking, processing, reporting, and control. The enterprise risk management framework comprises the activities and methods through which the Company maintains risk within acceptable risk tolerances. Business areas, pursuant to delegated authority, have primary responsibility for risk management. Working with the business areas, the Risk department seeks to identify, assess, measure, monitor and limit the risks consistently across the Company's businesses. The internal audit department and audit committee further provide independent control and assurance of the risk-management process.

*Process*

Processes and procedures are key components of the Company's risk management. The basis for its culture regarding risk-taking activities is the risk appetite. The Company establishes limits for each of its businesses based on its risk appetite, which is set by the Board. Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing their ability to profit from revenue-generating activities with their exposure to potential losses. Working with the business areas, the Risk department established a suite of limit techniques including, but not limited to, mandate limits applicable to specific businesses and risk types, value-at-risk, and stress scenario testing.

The Company has established and documented mandates for market risk assumed by its revenue-generating areas. For certain revenue-generating areas the risk mandates are supplemented with intra-day and overnight monitoring against the prescribed limits, both by the business areas and the Risk department. The Market Risk department quantifies and assesses risks, and escalates breaches to risk limits.

\*   \*   \*

Operational risk management is a systemic process maintained by the Operational Risk department to identify, assess, measure and manage operational risk. Each business area has established processes, systems, and controls to manage operational risk and is responsible for escalating incidents, issues and control indicators.

*People*

\*   \*   \*

The Company's senior management is responsible for implementing the risk management framework. The Company continually seeks to improve its technology and processes. In addition, the Company believes that effective risk

management requires its people to make judgments, interpretations and key business decisions that cannot entirely be controlled by process and technology. The Company strives to build a strong risk management team, which works closely with its management and business areas to deliver effective risk management. The Company's Risk department managers provide the additional support in understanding and controlling the nuances and limitations of the risk measures deployed.

<div align="center">*   *   *</div>

### Regulatory Capital Risk

The Company's ability to provide clearing services, which is a critical part of its business, depends heavily on its ability to maintain capital at its operating subsidiaries, including equity capital at or above specified minimum levels required by various regulators throughout the world. Additionally, principal trading activities have higher regulatory capital requirements than agency execution and clearing activities. The Company also needs capital and liquidity to protect the Company against the risk of default by its clearing clients and against clearing and settlement payment delays caused by systemic problems outside its control in one country or between countries. Various domestic and foreign government regulators, as well as self-regulated organizations (such as exchanges), with supervisory responsibility over its business activities require the Company to maintain specified minimum levels of regulatory capital in its operating subsidiaries.

To mitigate this risk, the Company continuously evaluates the levels of regulatory capital at each of its operating subsidiaries and adjusts the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements. Regulatory authorities may increase or decrease these requirements from time to time. The Company also maintains internal early warning levels and excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and the Company intends to continue to follow this policy. In addition, the Company monitors regulatory developments regarding capital requirements and prepares for increases in the required minimum levels of regulatory capital that may occur in the future. If not properly monitored and adjusted, its regulatory capital levels could fall below the required minimum amounts set by its regulators, which could expose the Company to various sanctions ranging from fines and censure to partial or complete restrictions on its ability to conduct business.

<div align="center">*   *   *</div>

### Risk Identification

The Operational Risk department maintains a disciplined and robust incident escalation and reporting program. The Enterprise Risk Management Policy identifies all employees as risk managers. As such, all employees have the mandate to escalate reportable incidents to their managers and the Operational

Risk department. The Operational Risk department facilitates the capture of incident data which allows for useful analysis and timely dissemination of information across the organization. Additionally, external incidents, or adverse events that occur externally and do not directly impact the Company, are monitored and considered. The Operational Risk department collects external incident data, disseminates relevant information and coordinates discussions as appropriate.

Key indicators provide a monitoring tool to alert management to controls' performance, risk levels, and trends that may be indicative of risk concerns. Selected indicator data is centrally collected by the Operational Risk department.

70.    The First Quarter 2012 Form 10-Q includes SOX Certifications of defendants Corzine and Steenkamp substantially the same as in ¶ 42 above.

71.    On August 4, 2011, the Company filed a Prospectus Supplement with the SEC on Form 424(b)(2) dated August 3, 2011 in connection with the public offering of $325 million worth of 6.250% Convertible Senior Notes due 2016. The Prospectus Supplement, which was issued pursuant to a Registration Statement filed with the SEC on Form S-3 dated February 24, 2010 signed by defendants MacDonald, Bolger, Carnwath, Fusco, Gelber, Glynn, Goldberg, Schamis, and Sloan, incorporates by reference the Company's 2011 Form 10-K, and First Quarter 2012 10-Q, among other things.

72.    On September 1, 2011, the Company amended its First Quarter 2012 10-Q filed on August 3, 3011 and stated, in part, as follows:

As previously disclosed, the Company is required to maintain specific minimum levels of regulatory capital in its operating subsidiaries that conduct its futures and securities business, which levels its regulators monitor closely. The Company was recently informed by the Financial Industry Regulatory Authority, or FINRA, that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-1. MF Global Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level. The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans. In addition, the Company expects that its regulatory capital requirements will continue to decrease as the

portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012.

73.     The statements contained in ¶¶ 39 - 72, were materially false and/or misleading when made because and failed to disclose that:

(a)  MF Global was materially undercapitalized;

(b)  MF Global lacked adequate capital to support its transformation and expansion into risky and principal transactions, including investments in European sovereign debt;

(c)  MF Global had been warned by regulators that it was operating out of compliance with regulatory capital requirements;

(d)  MF Global's internal and risk controls were not as represented and inadequate to allow the Company to properly balance risks and rewards as it underwent its transformation and expansion into risky and principal transactions;

(e)  MF Global's liabilities were materially understated on MF Global's balance sheet due to the Company's temporary reduction of its short-term borrowings each quarter shortly before reporting its quarterly financial results, a technique known as "window dressing";

(f)  MF Global was masking its true risk levels by materially reducing short-term borrowings each quarter shortly before reporting its quarterly results;

(g)  MF Global's reported financials were not prepared in accordance with Generally Accepted Accounting Principals ("GAAP");

(h)  MF Global was suffering from serious liquidity pressures based on its exposure to European sovereign debt; and

(i)  MF Global was diverting customer funds to support its own risky and principal transactions, including investments in European sovereign debt.

## VII.   THE TRUTH BEGINS TO EMERGE

74.     On the afternoon of October 24, 2011, Moody's slashed MF Global's credit-rating to Baa3, or nearly junk status, citing the Company's significant risk exposure to European debt as set forth above in ¶ 8. Following the downgrade, MF Global issued the following statement in an attempt to lessen the market's reaction:

> We are confident that we have the resources, capital, liquidity and expertise to successfully manage our European exposures to their end date maturity of December 2012, including the laddering of maturities before that date.
>
> As previously disclosed, the maturity characteristics, ratings profile and European support facility for lower rated credits reinforce our view that the portfolio is **sound and well structured.** (emphasis added).
>
> All three rating agencies have previously credited the improvements of our risk management, and two of the world's preeminent risk consultants have validated the improvements.

75.     On October 25, 2011, MF Global reported its second quarter 2012 financial results, including a larger than expected quarterly loss that widened on charges tied to deferred tax assets and a restructuring. During the October 25, 2011 conference call that ensued, the Company disclosed that its European sovereign debt exposure was more than $6 billion, although defendant Corzine affirmatively stated that these positions "have relatively little underlying principle risk in the time frame of our exposure."

76.     However, an article entitled "Corzine Strategy Snagged on Loss" published by the *Wall Street Journal* on October 25, 2011 reported as follows:

> Since taking over last year as CEO at MF Global Holdings Ltd., Jon Corzine has pushed the brokerage firm to look much more like Goldman Sachs Group Inc., where he made his name and fortune as a trader.
>
> Fears that the strategy is a dud deepened Tuesday when MF Global reported a wider fiscal second-quarter loss of $186.6 million. The New York company's shares sank $1.69 or 48%, to $1.86, in 4 p.m. New York Stock Exchange composite trading, their second-worst one-day percentage decline ever.

MF Global disclosed it still has about $6.3 billion in exposure to European sovereign debt.  That exposure is huge considering the firm took in just $12 million in revenue from principal trading during the latest quarter.

77.     Following the Moody's downgrade and MF Global's release of quarterly results, including $6.3 billion in European sovereign debt, MF Global's common stock declined by about 50% from a close of $3.68 per share on October 21, 2011 to close at $1.86 per share on October 25, 2011 on heavy trading volume.

78.     On October 26, 2011, Standard & Poor's threatened to also reduce the Company's credit-rating to junk status.  On October 26, 2011, MG Global's common stock declined by 8.6% to close at $1.70 per share.

79.     Then, on October 27, 2011, Fitch downgraded MF Global's credit-rating to junk status and released a statement regarding the downgrade that read, in part, as follows:

> In addition, the firm's increase in principal and, to a lesser extent, proprietary trading activities has elevated the firm's traditional risk profile. **These increased risk taking activities have resulted in sizeable concentrated positions relative to the firm's capital base, leaving MF vulnerable to potential credit deterioration and/or significant margin calls.** While Fitch notes that the firm has made some progress in rationalizing its capital structure, the firm's persistently weak earnings and leverage are no longer consistent with an investment grade financial institution.  (emphasis added).

80.     On October 27, 2011, MF Global's common stock declined by an additional 16%, $0.27 per share, to close at $1.43 per share.

81.     Also on October 27, 2011 after the markets closed, more bad news emerged about MF Global.  *Bloomberg News* reported that MF Global had exhausted two of its bank lines of credit, although the Company had only two days earlier on October 25, 2011 said that it had $1.3 billion in unused credit facilities.  Additionally, Moody's downgraded the Company's credit rating to "junk" status.

82.     The next trading day, October 28, 2011, MF Global's common stock declined by yet another 16%, to close at $1.20 per share.

83.     On October 31, 2011, MF Global filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.  Trading of MF Global's stock was also suspended.

84.     Then, shockingly, on the evening of October 31, 2011, the *New York Times* reported that federal regulators had discovered that hundreds of millions of dollars in customer money had gone missing from MF Global during its recent downturn and that regulators were investigating whether some customer funds may have been diverted to cover the Company's own trades.

85.     By the morning of November 1, 2011, the *Wall Street Journal* reported that numerous regulators, including the CFTC, SEC, CME and even the FBI, were investigating whether MF Global had diverted customer money and additional news reports started surfacing indicating that certain executives at MF Global had already admitted there was truth to these reports.

86.     On November 2, 2011 MF Global's common stock reopened for trading on the pink sheets under the symbol "MFGLQ" and plunged more than 79% to close at approximately $0.25 per share.

87.     Also on November 2-3, 2011, further news reports by both the *New York Times* and *Wall Street Journal* revealed that FINRA had discussed with MF Global whether the Company should set aside more capital at least as of June 2011 and that the Company had only increased its capital through debt offerings in August 2011 after Corzine failed to convince the regulators that their concerns were unfounded.

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

88.     As alleged herein, the MF Global Defendants acted with scienter in that the MF Global Defendants knew that the public documents and statements issued or disseminated in the

name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the MF Global Defendants, by virtue of their receipt of information reflecting the true facts regarding MF Global, their control over, and/or receipt and/or modification of MF Global's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning MF Global, participated in the fraudulent scheme alleged herein.

89.    The MF Global Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the MF Global Defendants

90.    The MF Global Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the MF Global Defendants were the most senior officers of MF Global, issued statements and press releases on behalf of MF Global and had the opportunity to commit the fraud alleged herein.  Additionally, the MF Global Defendants had the motive to disseminate materially false and misleading statements that artificially inflated the price of MF Global securities, as the Company sought to and did raise approximately $1.16 billion in capital during the Class Period through a secondary offering of common stock and three debt offerings during the Class Period referred to in ¶¶ 43, 60, 68 and 71.

IX.       **LOSS CAUSATION/ECONOMIC LOSS**

91.     During the Class Period, as detailed herein, the MF Global Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MF Global's securities and operated as a fraud or deceit on Class Period purchasers of MF Global's securities by misrepresenting the Company's operating condition and future business prospects. The MF Global Defendants achieved this by making positive statements about MF Global's business and financial results while they knew or recklessly disregarded that the Company's statements to investors were materially false and misleading and/or omitted to state material facts.  Later, however, when defendants' prior misrepresentations were disclosed and became apparent to the market, the price of MF Global's securities declined precipitously as the prior artificial inflation came out of the securities. As a result of their purchases of MF Global's securities during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws.

X.       **FRAUD-ON-THE-MARKET DOCTRINE**

92.     At all relevant times, the market for MF Global's securities was an efficient market for the following reasons, among others:

(a)     The Company's common stock was actively traded on the New York Stock Exchange (NYSE) in a highly efficient market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company was covered regularly by securities analysts; and

(d)     The Company regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

93.     As a result, the market for the Company's securities promptly digested current information with respect to MF Global from all publicly available sources and reflected such information in the price of the Company's common stock. Under these circumstances, all purchasers of MF Global's securities during the Class Period suffered similar injury through their purchase of the securities of MF Global at artificially inflated prices and a presumption of reliance applies.

**XI.     NO SAFE HARBOR**

94.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the MF Global Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MF Global who knew that those statements were false when made.

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder Against the MF Global Defendants**

95.     Plaintiff incorporates ¶¶ 1 - 94 by reference.

96.     During the Class Period, the MF Global Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.     The MF Global Defendants and MF Global itself violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a)     Employed devices, schemes and artifices to defraud;

        (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

        (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with his purchases of MF Global securities during the Class Period.

98.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MF Global securities. Plaintiff and the Class would not have purchased MF Global securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the MF Global Defendants' misleading statements.

99.     As a direct and proximate result of the MF Global Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of MF Global securities during the Class Period.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
### Against the MF Global Defendants

100.    Plaintiff incorporates ¶¶ 1 - 94 by reference.

101.    The MF Global Defendants acted as controlling persons of MF Global within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the MF Global Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The MF Global Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.    In particular, the MF Global Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.    As set forth above, the MF Global Defendants and MF Global itself each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as a controlling person, the MF Global Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of MF Global's and the MF Global Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 15, 2011            KAPLAN FOX & KILSHEIMER LLP

By: _____
          Frederic S. Fox
          Donald R. Hall
          Jeffrey P. Campisi
          Pamela A. Mayer
          850 Third Avenue
          New York, NY 10022
          Telephone:  212-687-1980
          Facsimile:  212-687-7714

          -and-

          LOCKRIDGE GRINDAL NAUEN PLLP
          Richard A. Lockridge
          Karen H. Riebel
          100 Washington Avenue South, Suite 2200
          Minneapolis, MN 55401
          Tel: (612) 339-6900
          Fax: (612) 339-0981

          *Counsel for Plaintiff*

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

I, Vasil Petro, hereby certify and swear as follows:

1. I have reviewed the attached Complaint against Jon S. Corzine, J. Randy MacDonald, other officers and directors of MF Global Holdings Ltd., and certain other entities alleging violations of the securities laws and authorize its filing;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter:

4. The following is a description of my transactions during the class period specified in the Complaint in the common stock of MF Global Holdings Ltd.:

| Transaction type | Trade date | No. of shares | Price per share |
|---|---|---|---|
| Purchase | 10/28/2011 | 10,000 | $1.30 |
| Purchase | 10/28/2011 | 195 | $1.23 |

5. I did not purchase common stock of MF Global Holdings Ltd. at the direction of my counsel or in order to participate in any private action under the federal securities laws;

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

VASIL PETRO

Date: _11 - 5 - 2011_